**UNITED STATES DISTRICT COURT**

**DISTRICT OF CONNECTICUT**

```
------------------------------------x
CONTROL MODULE, INC.,                :
     Plaintiff,                      :
v.                                   : Civ. No. 3:07CV00475 (AWT)
                                     :
DATA MANAGEMENT, INC.,               :
     Defendant.                      :
------------------------------------x
```

## RULING ON MOTION TO DISMISS COUNT II

Control Module, Inc. ("Control Module") brings this action against Data Management, Inc. ("Data Management"), and the defendant has moved to dismiss Count II of the Complaint. For the reasons set forth below, its motion is being granted.

**I. FACTUAL ALLEGATIONS**

For purposes of this motion, the court accepts as true the plaintiff's factual allegations as set forth in the Complaint.

Control Module designs and markets products used worldwide for applications such as time and attendance tracking, inventory control, work in process management, and access control. Data Management is in the business of creating and marketing computerized solutions for tracking employee time and attendance, including integrated hardware and software solutions. In 1998, Control Module began designing and building data-entry and collection computer terminals according to requirements provided by Data Management, a major customer for Control Module's

-1-

products.  The data-entry and collection computer terminal was to track employee time and attendance in conjunction with software developed by Data Management.

Timothy Morello and John Dybowski, were senior-level Control Module employees.  Morello began his employment as an electronic technician, moving to senior design engineer, head of the engineering department, product engineering manager, and Vice President of Product Engineering, which was the position he held when he terminated his employment with Control Module on September 3, 2004.  As Vice President of Product Engineering, Morello's responsibilities included new technology required for Control Module's customers, leading the product engineering department in the development of new products utilizing new technologies, and addressing customers' requirements.  He controlled the direction of research and development for the product engineering department.  Also, he was responsible for reviewing and interpreting specifications, developing specifications based on conceptual design discussions, and providing technology support for sales and marketing efforts.

Dybowski started his employment with Control Module as an electronic technician, then was a project engineer, and then was a senior design engineer until he resigned from Control Module on August 13, 2004.  As a senior design engineer, Dybowski's responsibilities included identifying the customer's

requirements, working with customers, such as Data Management, defining functional requirements, developing functional specifications, identifying the development tasks, and developing software drivers, software utilities, application software, diagnostic software, and hardware designs. He was also responsible for providing product support through manufacturing stages, test procedures, test fixture designs, specific component handling instructions and training, product support to the customer, and "support installations, trouble shooting, training and documentation" for Control Module's products. (Compl. ¶ 23).

While Morello was Vice President of Product Engineering, he was responsible for developing, with Dybowski's assistance, a product known as a "Stand Alone Terminal" ("SAT") at the request of Data Management. SAT is a data-collection computer terminal designed to track employee time and attendance in conjunction with software developed by Data Management. SAT would have had the ability to store data when disconnected from its computer network. In December 2003 and February 2004, SAT prototypes were created and demonstrated, but Data Management did not purchase any SAT from Control Module.

In March 2004, Jorge Ellis, the president of Data Management, offered Morello a job as Chief Technology Officer of Data Management. In April 2004, while he was still employed by Control Module, Morello met with Ellis in Dallas, Texas to

discuss Data Management's job offer.  After discussing the offer with Ellis, Morello invited Ellis to Morello's hotel room, where Morello demonstrated how a data collection terminal created by Dybowski worked.  After the demonstration, Ellis told Morello "if you build it, I will buy it."  Between April and June 2004, Morello and Dybowski created a business plan for a company named "Xipher Technologies, LLC," which contemplated a line of data-collection terminals called the "Integrity" series and listed Control Module as a competitor in designing and marketing data-collection terminals.  The business plan stated: "The initial goal will be to establish a successful technology alliance with Data Management, Inc."

In June 2004, key employees of Data Management, including Ellis, Mark Moorman (Data Management's Vice-President of Operations), David Bray (Data Management's Vice President of Research and Development), and members of Data Management's sales team secretly met with Morello and Dybowski at a hotel in Dallas, Texas to discuss Data Management's interest in the Integrity series of terminals.  Data Management never disclosed to Control Module Ellis' April 2004 meeting with Morello, the conversations after the meeting concerning a data-collection terminal, or the June 2004 meeting between the Data Management employees, Morello, and Dybowski.  The Integrity series would compete with Control Module's products designed exclusively for Data Management.

On or about September 22, 2004, Morello and Dybowski registered in Connecticut a business entity named Xipher Technologies, LLC ("Xipher"). In or around December 2004, they delivered a working prototype of an Integrity terminal to Data Management for testing. On or about February 28, 2005, Data Management began ordering Integrity terminals from Xipher. In March 2005, Data Management began marketing those terminals.

At all relevant times, Data Management knew that Control Module had an ongoing employment relationship with Morello and Dybowski, both of whom were long-time, high-level employees of Control Module. Control Module generates and keeps in its records, proprietary and confidential information such as methods, design plans, customer files, compilations, programs, techniques, processes, drawings, product specifications, cost data, pricing information, and other documents (collectively, the "Trade Secrets"). As a result of their positions at Control Module, Morello and Dybowski had knowledge of and access to the Trade Secrets, including Control Module's costs, pricing, and specifications for its data-collection terminal. Control Module derives economic value from the fact that the Trade Secrets are not known to and not readily ascertainable by proper means by other businesses in the field in which Control Module does business. Control Module made reasonable efforts to maintain the security of the Trade Secrets in several ways, including

restricting access to the Trade Secrets that could be found in its computer system and access to its business records.  Morello and Dybowski used their knowledge of the Trade Secrets in creating products to compete with products marketed by Control Module.

The Complaint sets forth five claims for relief.  The defendant has moved to dismiss Count II, in which the plaintiff alleges that the defendant misappropriated the Trade Secrets in violation of the Connecticut Uniform Trade Secrets Act by inducing, encouraging, aiding, or abetting Morello and Dybowski to use their knowledge of the Trade Secrets to create products to compete with those sold by Control Module.

**II. LEGAL STANDARD**

When deciding a motion to dismiss under Rule 12(b)(6), the court must accept as true all factual allegations in the complaint and must draw inferences in a light most favorable to the plaintiff. <u>Scheuer v. Rhodes</u>, 416 U.S. 232, 236 (1974).  A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.  <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957).  <u>See also</u> <u>Hishon v. King & Spaulding</u>, 467 U.S. 69, 73 (1984).  "The function of a motion to dismiss is 'merely to assess the legal feasibility of the complaint, not to assay the weight of the

evidence which might be offered in support thereof.'" Mytych v. May Dept. Store Co., 34 F.Supp. 2d 130, 131 (D. Conn. 1999), quoting Ryder Energy Distribution v. Merrill Lynch Commodities, Inc., 748 F.2d 774, 779 (2d Cir. 1984). "The issue on a motion to dismiss is not whether the plaintiff will prevail, but whether the plaintiff is entitled to offer evidence to support his claims." United States v. Yale New Haven Hosp., 727 F. Supp 784, 786 (D.Conn. 1990) (citing Scheuer, 416 U.S. at 232).

### III. DISCUSSION

With respect to Count II, the defendant argues that the plaintiff has failed to state a claim upon which relief can be granted because Control Module fails to allege that Data Management itself misappropriated any of the Trade Secrets. The court agrees.

One is subject to liability for trade secret infringement if one wrongfully appropriates another's trade secret. See Restatement (Third) of Unfair Competition §40 (1995). The Connecticut Uniform Trade Secrets Act, Conn. Gen. Stat. § 35-51 et seq. ("CUTSA") defines "misappropriation" as:

> (1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
> (2) disclosure or use of a trade secret of another without express or implied consent by a person who
>   (A) used improper means to acquire knowledge of the trade secret; or
>   (B) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade

-7-

>     secret was
>         (i) derived from or through a person who had
>         utilized improper means to acquire it;
>         (ii) acquired under circumstances giving rise
>         to a duty to maintain its secrecy or limit
>         its use, including but not limited to
>         disclosures made under section 1-210,
>         sections 31-40j to 31-40p, inclusive, or
>         subsection (c) of section 12-62; or
>         (iii) derived from or through a person who
>         owed a duty to the person seeking relief to
>         maintain its secrecy or limit its use; or
>     (C) before a material change of his position, knew
>     or had reason to know that it was a trade secret
>     and that <u>knowledge</u> of it had been <u>acquired</u> by
>     accident or mistake.

Conn. Gen. Stat. § 35-51(b)(2005) (emphasis added).

"[A] violation of CUTSA occurs only if the defendant either wrongfully acquired the plaintiff's trade secret or used or disclosed the trade secret." <u>Nora Beverages, Inc. v. Perrier Group of America, Inc.</u>, 164 F.3d 736, 750 (2d Cir. 1998). One cannot be liable pursuant to § 35-51(b)(1) unless one actually wrongfully acquires the trade secret, which means here that Data Management must itself possess or have gained control of the Trade Secrets through improper means. One cannot be liable pursuant to §35-51(b)(2) unless, having knowledge of the trade secret, one discloses or uses that trade secret, which means here that Data Management must itself have knowledge of and used or disclosed the Trade Secrets.

When there is no wrongful acquisition of the trade secret or knowledge coupled with disclosure or use of the trade secret, courts have found that there was no trade secret infringement.

-8-

See, e.g., Nora Beverages, 164 F.3d at 750 (motion for summary judgment properly granted where plaintiff offered no proof that any defendant wrongfully acquired, or disclosed or used, its trade secrets); Lydall, Inc. v. Ruschmeyer, 282 Conn. 209, 231 (2007) (concluding that the record did not support a finding that defendant used or disclosed trade secrets); News Am. Mktg. In-Store, Inc. v. Marquis, No. CV000177440S, 2003 WL 22904123, at *6-8 (Conn. Super. Oct. 22, 2003) (finding no misappropriation where there was no evidence that defendant acquired or disclosed any trade secrets).

Here, the Complaint does not allege that Data Management itself acquired or disclosed or used the Trade Secrets, only that Data Management purchased Integrity terminals from Xipher and that Data Management induced, encouraged, aided, or abetted the principals of Xipher to use the Trade Secrets in creating the Integrity terminals. However, CUTSA does not include within its definition of "misappropriation" inducing, encouraging, aiding, or abetting another to misappropriate a trade secret. Because the Complaint does not allege that Data Management acquired, disclosed, or used the Trade Secrets as contemplated by Conn. Gen. Stat. § 35-51(b), Count II fails to state a claim upon which relief can be granted pursuant to CUTSA, and should be dismissed.

**IV. CONCLUSION**

For the reasons set forth above, defendant Data Management,

Inc.'s Motion to Dismiss Plaintiff's Count II (Doc. No. 14) is hereby GRANTED.

It is so ordered.

Dated this 10th day of December 2007 at Hartford, Connecticut.

                                                  /s/AWT
                                          Alvin W. Thompson
                                United States District Judge